# STATE OF NORTH CAROLINA

_____ WAKE _____ County

File No. ▶

In The General Court of Justice
☐ District ☒ Superior Court Division

*Name of Plaintiff*

KULBIR SIDHU, M.D.

*Address*

*City, State, Zip*

## CIVIL SUMMONS

☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

### VERSUS

G.S. 1A-1, Rules 3, 4

*Name of Defendant(s)*
CANCER CENTERS OF NORTH CAROLINA, P.C. and
RALEIGH HEMATOLOGY ONCOLOGY ASSOCIATES, P.C.,

*Date Original Summons Issued*

*Date(s) Subsequent Summon(es) Issued*

## To Each Of The Defendant(s) Named Below:

*Name And Address of Defendant 1*
RALEIGH HEMATOLOGY ONCOLOGY ASSOCIATES, P.C.
c/o Larry E. Robbins, Registered Agent
4101 Macon Pond Road
Raleigh, NC 27607

*Name And Address of Defendant 2*

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

*Name And Address of Plaintiff's Attorney (If None, Address of Plaintiff)*
J. Heydt Philbeck
Bailey & Dixon, L.L.P.
434 Fayetteville Street, Suite 2500
Raleigh, North Carolina 27601

*Date Issued*
August 14, 2012

*Time* 4:40 ☐ AM ☑ PM

*Signature*

☑ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk of Superior Court*

☐ **ENDORSEMENT (ASSESS FEE)**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

*Date of Endorsement*

*Time* ☐ AM ☐ PM

*Signature*

☐ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk of Superior Court*

NOTE TO PARTIES: *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

EXHIBIT

A

ALL-STATE LEGAL®

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name of Defendant |
|---|---|---|
| | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

> Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name of Defendant |
|---|---|---|
| | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to person named below.

> Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Signature of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name of Sheriff (Type or Print) |
| Date of Return | County of Sheriff |

# STATE OF NORTH CAROLINA

WAKE County

In The General Court of Justice
☐ District ☒ Superior Court Division

File No.

Name of Plaintiff

KULBIR SIDHU, M.D.

Address

City, State, Zip

**VERSUS**

Name of Defendant(s)
CANCER CENTERS OF NORTH CAROLINA, P.C. and
RALEIGH HEMATOLOGY ONCOLOGY ASSOCIATES, P.C.,

# CIVIL SUMMONS

☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3, 4

Date Original Summons Issued

Date(s) Subsequent Summon(es) Issued

## To Each of The Defendant(s) Named Below:

Name And Address of Defendant 1
CANCER CENTERS OF NORTH CAROLINA, P.C.
c/o Larry E. Robbins, Registered Agent
4101 Macon Pond Road
Raleigh, NC 27607

Name And Address of Defendant 2

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address of Plaintiff's Attorney (If None, Address of Plaintiff)
J. Heydt Philbeck
Bailey & Dixon, L.L.P.
434 Fayetteville Street, Suite 2500
Raleigh, North Carolina 27601

Date Issued
August 14, 2012

Time
4:40 ☐ AM ☐ PM

Signature

☑ Deputy CSC   ☐ Assistant CSC   ☐ Clerk of Superior Court

☐ ENDORSEMENT (ASSESS FEE)
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

Date of Endorsement

Time
☐ AM ☐ PM

Signature

☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk of Superior Court

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

# STATE OF NORTH CAROLINA

WAKE _____ County

In The General Court of Justice
☐ District ☒ Superior Court Division

**Name and Address of Plaintiff 1**
KULBIR SIDHU, M.D.

2012 AUG 14 PM 4:40

WAKE COUNTY, C.S.C.

**Name and Address of Plaintiff 2**

BY.....

**VERSUS**

## GENERAL
## CIVIL ACTION COVER SHEET
☒ INITIAL FILING   ☐ SUBSEQUENT FILING

*Rule 5(b), Rules of Practice for Superior and District Courts*

*Name And Address of Attorney or Party, If Not Represented (complete for initial appearance or change of address)*
J. Heydt Philbeck
434 Fayetteville Street, Suite 2500
Raleigh, NC 27601

| *Telephone No.* 919-828-0731 | *Cell Telephone No.* |
|---|---|
| *NC Attorney Bar No.* 19379 | *Attorney E-Mail Address* hphilbeck@bdixon.com |

**Name of Defendant 1**
CANCER CENTERS OF NORTH, P.C.

| Summons Submitted ☒ Yes ☐ No | ☒ Initial Appearance in Case | ☐ Change of Address |

**Name of Defendant 2**
RALEIGH HEMATOLOGY ONCOLOGY ASSOCIATES, P.C.

*Name of Firm*
Bailey & Dixon, L.L.P.
*FAX No.*
919-828-6592
*Counsel for*
☒ All Plaintiffs ☐ All Defendants ☐ Only *(List party(ies) represented)*

| Summons Submitted ☒ Yes ☐ No |

☐ Jury Demanded in Pleading
☐ Complex Litigation

☐ Amount in controversy does not exceed $15,000
☐ Stipulate to arbitration

## TYPE OF PLEADING

*(check all that apply)*
☐ Amend (AMND) *Assess Motion Fee*
☐ Amended Answer/Reply (AMND-Response) *Assess Motion Fee*
☐ Amended Complaint (AMND) *Assess Motion Fee*
☐ Answer/Reply (ANSW-Response)
☐ Change Venue (CHVN) *Assess Motion Fee*
☒ Complaint (COMP)
☐ Confession of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL) *Assess Motion Fee*
☐ Contempt (CNTP) *Assess Motion Fee*
☐ Continue (CNTN) *Assess Motion Fee*
☐ Compel (CMPL) *Assess Motion Fee*
☐ Counterclaim vs. (CTCL) *Assess Court Costs*
☐ Crossclaim vs. (List on back) (CRSS) *Assess Court Costs*
☐ Dismiss (DISM) *Assess Court Costs*
☐ Exempt/Waive Mediation (EXMD) *Assess Motion Fee*
☐ Extend Statute of Limitations, Rule 9 (ESOL) *Assess Motion Fee*
☐ Extend Time For Complaint (EXCO) *Assess Motion Fee*

*(check all that apply)*
☐ Failure to Join Necessary Party (FJNP) *Assess Motions Fee*
☐ Failure to State a Claim (FASC) *Assess Motions Fee*
☐ Improper Venue/Division (IMVN) *Assess Motions Fee*
☐ Intervene (INTR) *Assess Motions Fee*
☐ Interplead (OTHR) *Assess Motions Fee*
☐ Lack of Jurisdiction (Person) (LJPN) *Assess Motions Fee*
☐ Lack of Jurisdiction (Subject Matter) (LJSM) *Assess Motions Fee*
☐ Rule 12 Motion In Lieu Of Answer (MDLA) *Assess Motions Fee*
☐ Sanctions (SANC) *Assess Motions Fee*
☐ Set Aside (OTHR) *Assess Motions Fee*
☐ Show Cause (SHOW) *Assess Motions Fee*
☐ Transfer (TRFR) *Assess Motions Fee*
☐ Third Party Complaint (List Third Party Defendants on Back) (TPCL)
☐ Vacate/Modify Judgment (VCMD) *Assess Motions Fee*
☐ Withdraw as Counsel (WDCN) *Assess Motions Fee*
☐ Other *(specify and list each separately)*

**NOTE:** *See Side Two for a list of motions not subject to the motions fee.*

## CLAIM FOR RELIEF

☐ Administrative Appeal (ADMA)
☐ Appointment of Receiver (APRC)
☐ Attachment/Garnishment (ATTC)
☐ Claim and Delivery (CLMD)
☐ Collection on Account (ACCT)
☐ Condemnation (CNDM)
☐ Contract (CNTR)
☐ Discovery Scheduling Order (DSCH)

☐ Injunction (INJU)
☐ Medical Malpractice (MDML)
☐ Minor Settlement (MSTL)
☐ Money Owed (MNYO)
☐ Negligence – Motor Vehicle (MVNG)
☐ Negligence – Other (NEGO)
☐ Motor Vehicle Lien G.S. 44A (MVLN)

☐ Limited Driving Privilege – Out-of-State Convictions (PLDP)
☐ Possession of Personal Property (POPP)
☐ Product Liability (PROD)
☐ Real Property (RLPR)
☐ Specific Performance (SPPR)
☒ Other *(specify and list separately)*
Wrongful Termination/ADAAA

| *Date* 8/14/12 | *Signature of Attorney/Party* |

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must either include a General Civil (AOC-CV-751), Motions (AOC-CV-752) or Court Action (AOC-CV-753) cover sheet.*

AOC-CV-751, Rev. 6/11 © 2011 Administrative Office of the Courts          (Over)

**DO NOT CHARGE MOTIONS FEE**
Assess costs (COST) Including Attorney's Fees (ATTY)
Implementation Of Wage Withholding In Non-IV-D Cases) (OTHR)
Modification Of Child Support In IV-D Actions (MSUP)
Notice of Dismissal With Or Without Prejudice (VOLD)
Petition To Sue As Indigent (OTHR)

**DO NOT CHARGE MOTIONS FEE. FEES IN GS 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**DO NOT CHARGE MOTIONS FEE. OTHER FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out Of State Attorney/Pro Hac Vice Fee)
Request For Subpoena By Out-Of-State Attorney

| No. | ☐ Additional Plaintiff(s) |
|-----|---------------------------|
|     |                           |
|     |                           |
|     |                           |
|     |                           |
|     |                           |

| No. | ☐ Additional Defendant(s)    ☐ Third Party Defendant(s) | Summons Submitted |
|-----|----------------------------------------------------------|-------------------|
|     |                                                          | ☐ Yes ☐ No        |
|     |                                                          | ☐ Yes ☐ No        |
|     |                                                          | ☐ Yes ☐ No        |
|     |                                                          | ☐ Yes ☐ No        |
|     |                                                          | ☐ Yes ☐ No        |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO:

KULBIR SIDHU, M.D., )
)
Plaintiff, )
)
v. )
)
CANCER CENTERS OF NORTH )
CAROLINA, P.C. and RALEIGH )
HEMATOLOGY ONCOLOGY )
ASSOCIATES, P.C., )
)
Defendants. )

COMPLAINT

NOW COMES plaintiff KULBIR SIDHU, M.D. ("Plaintiff"), by and through counsel

and pursuant to N.C. R. Civ. P. 8 and 42 U.S.C. § 12101, *et seq.,* as amended ("ADAAA") *inter*

*alia,* complaining against defendant CANCER CENTERS OF NORTH CAROLINA, P.C.

(individually "CCNC" and collectively "Defendants") and RALEIGH HEMATOLOGY

ONCOLOGY ASSOCIATES, P.C. (individually "RHOA" and collectively "Defendants"),

alleges and says as follows:

## PARTIES AND JURISDICTION:

1.     Plaintiff is a citizen and resident of Wake County, North Carolina.

2.     At all times relevant herein, Plaintiff has been duly licensed as a physician by the

North Carolina Medical Board and authorized to engage in the practice of medicine, pursuant to

N.C. Gen. Stat. §§ 90-1, *et seq.*

3.     On information and belief, Defendant CCNC is, and has been at all times relevant

herein, a professional corporation organized and existing under North Carolina law and doing

business in North Carolina, with its principal place of business in Wake County, North Carolina.

4.     On information and belief, Defendant RHOA is, and has been at all relevant times herein, a professional corporation organized and existing under North Carolina law doing business in North Carolina, with its principal place of business in Wake County, North Carolina.

5.     On or about November 24, 2008, on information and belief, Defendant RHOA filed an "articles of amendment" with the North Carolina Secretary of State to amend its articles of incorporation to change its name to Defendant CCNC. A true copy of the above-referenced articles of amendment has been attached hereto as EXHIBIT A and is incorporated herein by reference.

6.     On information and belief, by filing the above-referenced articles of amendment, Defendant CCNC adopted or subscribed to all acts of Defendant RHOA and that Defendant RHOA adopted or subscribed to all acts of Defendant CCNC, as alleged herein, such that all actions of Defendants' managers, directors, and employees are attributable jointly and severally to Defendant CCNC and Defendant RHOA. Hereafter, unless specifically indicated otherwise, Defendant CCNC and Defendant RHOA will both individually and collectively be referred to as "Defendants."

7.     On information and belief, any and all acts of Defendants' managers, directors, and employees, as alleged herein, were conducted within the direction of, or on behalf of, Defendants, or were conducted within the course and scope of job duties for any such referenced manager, director and employee, as agents for Defendants. As such, all actions of Defendants' managers, directors, and employees, as alleged herein, are jointly and severally attributable to Defendants. Moreover, on information and belief, Defendants authorized or ratified all acts of Defendants' mangers, directors, and employees, as alleged herein.

8.      On information and belief and at all times relevant herein, Defendants have been duly licensed and authorized by the State of North Carolina to provide professional services in the practice of medicine and health care under N.C. Gen. Stat. §§ 55B-1, *et seq.* and N.C. Gen. Stat. §§ 90-1, *et seq.*

9.      On information and belief and at all times relevant herein, Plaintiff was an "employee" of Defendants within the meaning of 42 U.S.C. § 12111(4).

10.     At all times relevant herein, Defendants have been engaged in an industry affecting commerce, pursuant to 42 U.S.C. § 12111(5)(A), by providing medical services and treatment for profit to citizens throughout North Carolina and have been covered entities within the meaning of 42 U.S.C. § 1211(2).

11.     At all times relevant herein, Defendants have had fifteen (15) or more employees for each working day in each of twenty (2) or more calendar weeks in the current or preceding calendar year, and therefore, is an "employer," pursuant to 42 U.S.C. § 12111(5)(A), with no applicable exception.

12.     At all relevant times herein, the employment and business practices alleged in this complaint were committed in Wake County, North Carolina.

ADMINISTRATIVE REMEDIES:

13.     On October 17, 2011, Plaintiff filed a charge of discrimination (Charge No: 433-2012-00169) with the United States Equal Employment Opportunity Commission ("EEOC") against Defendants claiming that Defendants discriminated against Plaintiff because of her disabilities *inter alia* by terminating the employment of Plaintiff and by failing to provide Plaintiff with reasonable accommodations for her disabilities, contrary to the requirements of the ADAAA.

3

14.     Plaintiff timely filed the above-referenced charge of discrimination with the EEOC within 180 days of the occurrence of the acts or omissions in which Plaintiff complains.

15.     On May 17, 2012, the EEOC issued Plaintiff a "notice of rights" letter (EEOC Form 161) in response to the above-referenced charge of discrimination.  On or after May 18, 2012, Plaintiff first received the above-referenced "notice of rights" letter from the EEOC via U.S. Mail.  A true copy of the above-referenced "notice of rights" letter is attached hereto as EXHIBIT B and is incorporated herein by reference.

16.     Plaintiff filed this action against Defendants for disability discrimination *inter alia* within 90 days from her initial receipt of the above-referenced "notice of rights" letter from the EEOC.

17.     Pursuant to 42 U.S.C. § 12117(a), Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

<u>COMMON FACTUAL ALLEGATIONS</u>:

*Plaintiff's Practice as a Radiation Oncologist*

18.     From around January 2, 2006 to August 10, 2011, Plaintiff was employed full-time by Defendants as a duly licensed physician to provide medical services to cancer patients. Prior being employed by Defendants, Plaintiff had served as an Assistant Professor of Radiation Oncology at the Thomas Jefferson University in Philadelphia, Pennsylvania.

19.     At all times relevant herein, Plaintiff has been a nationally recognized and respected physician.  From around 2003 to 2008, Plaintiff served as co-chair for the National Chemoprevention and Community Clinical Oncology Program at Radiation Therapy Oncology Group, which is an oncology research group that is funded by the National Cancer Institute ("NCI").  Plaintiff has also served on the national steering and advisory panel for a number of

4

other NCI sponsored research committees and committees for the American Society of Radiation Oncology. Around 2004, the United States Department of Defense, Division of Medical Research and NCI (Canada) selected Plaintiff to peer review medical research grants submitted by international cancer researchers. At all times relevant herein, Plaintiff has been duly qualified to perform her job as a radiation oncologist and has met or exceeded all reasonable work expectations of Defendants.

20.     The practice of oncology generally consists of physicians known as "medical oncologists" and physicians known as "radiation oncologists." Radiation oncologists generally perform patient treatment and care that is more "surgical" in nature. Medical oncologists generally treat cancer patients through the use of chemotherapy. Similar to that of Defendants, oncology practices often have both kinds of oncologists who work together in the treatment of cancer patients. At all times relevant herein, Plaintiff has been a radiation oncologist.

21.     To provide effective and efficient medical care to patients, radiation oncologists generally need specialized radiation oncology nursing assistance by a specially trained and experienced registered nurse ("RN"). Generally, radiation oncology RNs clinically manage and assist patients who are receiving daily treatment from the radiation oncologist. The services of qualified radiation oncology RNs permit the radiation oncologists to focus on treating cancer patients efficiently and effectively by engaging in radiotherapy procedures, designing and calculating radiation treatments, and attending all urgent medical care issues.

22.     In a busy medical practice that provides onsite invasive procedures and that treats patients with highly complicated medical needs, similar to that of Plaintiff's medical practice, it is essentially mandatory that each radiation oncologist be provided with his or her own qualified

and experienced radiation oncology RN to ensure patient safety along with effective and efficient treatment.

23.     Because of Plaintiff's particularized professional experience and special training, other physicians, both within and without Defendants' offices, frequently referred patients to Plaintiff who have significantly more complicated, advanced cancer, or technically challenging cancer treatment issues. For example, Plaintiff would often receive referrals of patients with Head and Neck cancers or gynecologic cancers requiring invasive procedures and sedation. Plaintiff's need for assistance by a qualified radiation oncology RN in her medical practice was particularly pronounced because of the nature of Plaintiff's patients who often had these complicated or technically challenged cancer treatment needs.

*Plaintiff's Medical Practice at CCNC and RHOA*

24.     On or about January 2, 2006, Defendants hired Plaintiff to serve as a full-time radiation oncologist and to provide medical care services to cancer patients.

25.     At all times relevant herein, Defendants had generally subdivided their medical offices between two major departments: the medical oncology department and the radiation oncology department.

26.     While employed by Defendants, Plaintiff worked in the radiation oncology department where Plaintiff practiced her medical specialty as radiation oncologist in treating cancer patients through the medicinal use of radiation. From around January 2, 2006 to around May 2011, Defendants' radiology department consisted of two physicians: Plaintiff and John F. Reilly, M.D. ("Reilly").

27.     From at least January 2, 2006 to approximately June 2010, Defendants assigned only one full-time RN to its radiation oncology department. By having only one full-time RN,

6

Defendants' staffing was insufficient to provide an efficient level of safe and effective patient care for the number of patients in which Defendants were providing medical services.

28.     Throughout Plaintiff's tenure of employment, Defendants never provided Plaintiff with the services of a properly qualified radiation oncology RN for any appreciable period. During her employment, Plaintiff became concerned for patient safety when there was no radiation oncology RN available to assist Plaintiff's patients in receiving radiation, particularly those patients who had complicated medical treatment needs.

29.     In spite of receiving no appreciable assistance by radiation oncology RN, Plaintiff worked even harder to overcome the consequent disadvantage in providing efficient and effective medical care to her cancer patients.  Under these circumstances, Plaintiff met or exceeded Defendants' reasonable work expectations.

30.     Around Summer 2010, Defendants hired an RN who was to work part-time as a radiation oncology nurse at Defendants' expense and was to work part-time as a medical scribe for Plaintiff at Plaintiff's expense.  However, this part-time RN had insufficient training and experience in radiation oncology nursing.  Moreover, Plaintiff was required to expend a significant amount of her work time in training the newly-hired RN to function both as a radiation oncology nurse and as a medical scribe.  Soon after being hired by Defendants, the full-time radiation oncology RN separated from her employment with Defendants.  With the separation of the full-time radiation oncology RN, Defendants had only the newly-hired RN, who had insufficient training and experience to assist both Plaintiff and Reilly.

*Plaintiff Goes on Disability Leave*

31.     During Summer 2010, on information and belief, several of Defendants' oncology practitioners suspected that Plaintiff had begun suffering from depression.  On information and

7

belief, around June and July 2010, Defendants' oncologists would secretly meet outside Plaintiff's presence and without her knowledge to discuss Plaintiff's personal health situation along with her private marital issues.

32.     Around July 28, 2010, Defendants' president, Alan D. Kritz, M.D. ("Kritz") informed Plaintiff that Defendants' oncologists had a meeting to discuss both Plaintiff's personal health situation and marital issues.  Kritz informed Plaintiff that Defendants' shareholders had discussed and considered terminating Plaintiff's employment effective immediately.  However, Kritz informed Plaintiff that Defendants' shareholders ultimately determined instead that Plaintiff would be required to go on disability leave effective immediately for an indeterminate period and directed Plaintiff to see a specific psychiatrist for a health evaluation.

33.     On or about August 1, 2010 and in compliance with Kritz's directive, Plaintiff went on disability leave and sought the health care services of the designated board certified psychiatrist.

34.     During Plaintiff's initial evaluation on or about August 19, 2010, the designated psychiatrist diagnosed Plaintiff with having major depression (individually and collectively "disabilities").  The designated psychiatrist further suspected that Plaintiff was also afflicted with *attention deficit disorder* ("ADD")(individually and collectively "disabilities"), but wanted to treat Plaintiff's depression before beginning the treatment for ADD.  Following the initial evaluation, Plaintiff began taking medication for major depression under the direction and guidance of the designated psychiatrist.  Later in around October 2010, the designated psychiatrist formally diagnosed Plaintiff with having ADD.

35.     The major depression substantially affected Plaintiff's ability to concentrate in her work and personal situations, caused low energy, created insomnia and difficulty in sleeping,

8

feeling "slowed down" and feeling "locked" or "blocked" with certain tasks. The concurrent ADD caused Plaintiff to become more disorganized, forgetful and distractible. The major depression curbed or degraded the compensation skills that Plaintiff had utilized to cope with the ADD.

36.     During the period that Plaintiff was on disability leave, Kritz required that Plaintiff meet with him on a week-to-week basis to get updates on Plaintiff's condition. On information and belief, Kritz periodically reported Plaintiff's confidential medical conditions of major depression, ADD, and her private marital relationship information to Defendants' other oncologists and various staff members without any reasonable justification for leaking the same. During this time and thereafter, Plaintiff's confidential medical conditions of major depression, ADD and private marital relationship information became well-known by most, if not all, of Defendants' oncologists as well as many of Defendants' staff members.

37.     Plaintiff remained on disability leave from around August 1, 2010 to around November 1, 2010. During this period, Defendants hired a full-time, qualified and experienced radiation oncology RN, Diane Bullock ("Bullock") and reassigned the predecessor RN to Defendants' medical oncology department.

38.     Kritz directed Plaintiff to return from disability leave beginning on November 1, 2010. Plaintiff informed Kritz that she would only be able to return to work if she had a full-time radiation oncology RN to assist Plaintiff with patient care, including those requiring complicated treatment procedures. Plaintiff knew that even though she would be capable of performing her duties, Plaintiff would need the additional, qualified assistance because of the residual effects of depression and ADD. Although Kritz was generally dismissive about

Plaintiff's conditions of depression and ADD, Kritz assured Plaintiff that this additional radiation oncology RN assistance would be provided to her in patient care.

*Plaintiff Returns to Work from Disability Leave*

39.    At Kritz's direction, Plaintiff returned to work for Defendants on or about November 1, 2010, notwithstanding the status or prognosis of Plaintiff's personal health condition.

40.    Just prior to Plaintiff's return, Kritz had informed Plaintiff that Defendants would be providing two experienced and qualified radiation oncology RN's for the radiation oncology department so that both radiation oncologists, Plaintiff and Reilly, would each have his or her own qualified radiation oncology RN for patient treatment and care.

41.    Shortly after her return, Plaintiff learned that Defendants had assigned the existing qualified radiation oncology RN, Bullock, exclusively to Reilly in the treatment and care of his patients. Plaintiff learned that Defendants had assigned a lower-level, unqualified, inexperienced, lesser trained licensed practical nurse ("LPN") exclusively to Plaintiff in the treatment and care of her patients.

42.    In the medical field, the skill-level, training and educational requirements necessary to be licensed as an LPN are substantially less than that which is required to be licensed as an RN. The nursing assistance that Defendants provided to Plaintiff was woefully inadequate not only for Plaintiff's patients who had complex cancer treatment needs, but also Plaintiff's patients who had more common cancer treatment needs.

43.    On information and belief, the LPN assigned exclusively to Plaintiff had *inter alia*: 1) no meaningful experience in radiation oncology; 2) no radiation experience; 3) no

10

training in radiation oncology clinical care and clinical assessment; 4) no training in RN level clinical and patient care; and 2) no personal experience in radiation oncology patient care.

44.     By assigning the unqualified LPN to the exclusive use of Plaintiff for her patient care, Defendants, in essence, placed the burden solely on Plaintiff to train the LPN, to the extent that she could be trained, in various specialized patient care tasks that the LPN was not sufficiently competent to provide. The additional training time required Plaintiff to take significant time away from the performance of her own professional duties and treatment of patients, including patient records documentation tasks, without any additional compensation.

45.     Also after returning to work, Plaintiff noticed that many oncologists and even staff members almost immediately began treated her differently, on information and belief, because of Plaintiff's disabilities. For instance, staff members became substantially less cooperative with Plaintiff in their work duties connected with Plaintiff's cancer patients. The staff members became significantly more dismissive not only about the needs of Plaintiff's patients, but also towards Plaintiff's authority as a licensed physician.

46.     Additionally, after her return, Plaintiff noticed that Defendants' oncologists likewise became markedly less cooperative and collegial in demeanor and more "distant" in their professional interactions with Plaintiff. This unprofessional treatment of Plaintiff by both physicians and staff continued throughout the balance of Plaintiff's employment.

47.     On information and belief, Defendants had no RNs who were trained in Advanced Cardiac Life Support (or "ACLS certified") to protect sedation patients from unnecessary risks. Despite Plaintiff's protestations, Defendants refused to get an RN who was ACLS certified, which caused unnecessary, but significant stress on Plaintiff in her care of patients.

48. Faced with woefully inadequate radiation oncology nursing services, Plaintiff within a few months after returning from disability leave, requested authorization to hire a medical scribe at Plaintiff's own personal expense to work under Plaintiff's direct supervision. Plaintiff's medical scribe would handle the documentation and "paperwork" tasks necessary for patient care while accommodating her disabilities. Defendants had previously authorized Plaintiff to use the services of a scribe prior to Plaintiff going on disability leave.

49. The medical scribe would provide Plaintiff with more time to focus more on the actual medical treatment of cancer patients and otherwise operate in a more efficient, effective manner with quicker turnaround in documentation tasks.

50. In late February 2010, after having received authorization by Defendants' managers, Plaintiff hired a medical scribe at her own personal expense to work under her direct supervision in assisting with the documentation and "paperwork" pertaining to her medical practice. On numerous occasions, Plaintiff had discussed with Kritz about difficulties with documentation given her disabilities and had discussed how a medical scribe would accommodate these difficulties.

51. On or about March 9, 2011, Defendants' Kritz and other managers met with Plaintiff to discuss alleged concerns about the need for Plaintiff to complete patient care documentation and "paperwork" in a more prompt manner.

52. During this meeting, Kritz also informed Plaintiff that she had to terminate immediately the employment of the medical scribe who Plaintiff had just hired about ten days prior. Kritz attempted to justify his directive by asserting that there was "no precedent in the

practice for this type of employee" with nothing more. Plaintiff was not privy to any of the apparent executive discussions related to any "policy" on the use of medical scribes.

53. Kritz directed Plaintiff instead to hire a nurse practitioner ("NP") or a physician's assistant ("PA"). To be licensed as an NP or PA, a candidate must receive a substantially more specialized post-graduate college education. The hiring of an NP or PA is better suited for the "internal medicine" type practice that is more closely aligned to the practice of a medical oncologist than that of a radiation oncologist, like Plaintiff.

54. The cost to hire an NP or PA is substantially more than the cost to hire a medical scribe. The work of medical "scribing" is also not generally a true function of the work that NP's or PA's typically perform in their job duties. It is unlikely that an NP or PA would find the job description that solely consists of medical "scribing" to be professionally satisfying.

55. Kritz's requirement that Plaintiff terminate her medical scribe, and hire an NP or PA instead to perform the essentially perfunctory work of a medical scribe was not only grossly inefficient and wasteful, but also substantially more costly to Plaintiff's personal finances. Moreover, Plaintiff and Reilly had previously shared the use of a PA, but Reilly had found that the use of a PA was not particularly helpful and wanted to rid the section of PA assistance. Kritz's suggestion had already been tried, but was found to be unhelpful.

*Defendants Terminate Plaintiff's Employment*

56. On or about April 2011, Defendants hired or retained two additional physicians to serve as radiation oncologists. On information and belief, Defendants had already formulated the intent to terminate Plaintiff's employment during or before April 2011.

57. On information and belief, Defendants provided both of the newly-hired radiation oncologists with two experienced, properly trained radiation oncology nurses to work

13

independently and exclusively for each of the newly-hired radiation oncologists in providing care to their patients.

58.     On or about August 10, 2011, Defendants informed Plaintiff that she was terminated from her employment with Defendants allegedly because Plaintiff was ineffective and inefficient in the completion of documentation and "paperwork" requisite to the treatment and care of Plaintiff's patients.

59.     Continually from around November 1, 2010 to Plaintiff's termination on August 10, 2011, Plaintiff had sought reasonable accommodations from Defendants for her disabilities through the use of a properly qualified radiation oncology RN at Defendants' expense and/or the use of a medical scribe at her own expense, but to no avail.

60.     Up to and including the date of Plaintiff's termination, Defendants in their treatment and handling of Plaintiff, was consistent with that of an at-will employee. At all times relevant herein, Defendants: 1) failed to provide Plaintiff with any notice of any meeting to discuss Plaintiff's termination, 2) failed to provide Plaintiff with any vote concerning her termination, 3) failed to permit Plaintiff the opportunity to address Defendants' shareholders or directors about or concerning Plaintiff's proposed termination, 4) never provided Plaintiff with any buy-out offer or information; 5) had never issued Plaintiff any stock or ownership in the medical practice; 6) had never required Plaintiff to sign any shareholder or ownership agreement; and 7) never provided Plaintiff with any executive or ownership authority; and otherwise treated Plaintiff as an at-will employee instead of a shareholder.

<u>FIRST CLAIM FOR RELIEF:</u>
(ADAAA-Disparate Treatment)

61.     The foregoing allegations are hereby realleged and fully incorporated herein by reference as if fully set forth herein.

62.     At all times relevant herein, Plaintiff has been "disabled," under 42 U.S.C. §
12101(2) in that Plaintiff has had a physical or mental impairment that substantially limited one
or more of the major life activities of Plaintiff. Namely, at all times relevant herein, Plaintiff
suffered from major depression and ADD.

63.     At all times relevant herein, Plaintiff was a "qualified individual with a disability"
within the meaning of 42 U.S.C. § 12111(8), in that with, or without reasonable accommodation,
as defined in 42 U.S.C. § 12111(9), Plaintiff could perform the essential functions of her
employment position, but for Defendants' acts of illegal disability discrimination, as alleged
herein.

64.     On information and belief, Defendants wrongfully and intentionally discriminated
against Plaintiff because of her disabilities in violation of the *Americans with Disabilities Act of
1990*, as amended and codified in 42 U.S.C.A. §§ 12111, *et seq.* ("ADA") in at least the
following independent, collective or alternative ways:

A.     On or about August 10, 2011 when Defendants terminated Plaintiff's
employment because of her disability of suffering from major depression;

B.     On or about August 10, 2011 when Defendants terminated Plaintiff's
employment because of her disability of being afflicted with ADD;

C.     On or about August 10, 2011 when Defendants terminated Plaintiff under
the pretext of being untimely or inaccurate in the documentation and "paperwork" attendant to
the care of patients when Plaintiff's work performance in patient care documentation and
"paperwork" was substantially similar or better and more timely than that completed by
Defendants other non-disabled radiation oncologists;

15

D. On or about August 10, 2011 when Defendants terminated Plaintiff's employment because Plaintiff was "regarded as" having had the disability of major depression and/or ADD;

E. On or about August 10, 2011 when Defendants terminated Plaintiff's employment because of Plaintiff's "record of" having a disability by having been diagnosed with major depression and/or ADD;

F. Continuously from November 1, 2010 to August 10, 2011 when Defendants refused, or otherwise failed to provide, Plaintiff with reasonable accommodation on the basis of Plaintiff's disabilities of clinical major depression and/or ADD by refusing to grant Plaintiff the authority to hire and keep a medical scribe (or other comparable person at the same or substantially similar expense) to work under Plaintiff's direct supervision and at her own personal expense to assist in completing the documentation and "paperwork" related to the treatment and care of Plaintiff's patients;

G. Continuously from November 1, 2010 to August 10, 2011 when Defendants failed to provide Plaintiff with reasonable accommodation on the basis of her disabilities of major depression and/or ADD by refusing to hire or otherwise provide at Defendants' expenses with the following: 1) an experienced, qualified and properly trained radiation oncology RN to assist Plaintiff exclusively, or even extensively, in the treatment and care of Plaintiff's patients (just as Defendants had provided its non-disabled radiation oncologists) and 2) a nurse practitioner, physician assistant, medical scribe or other such qualified or experienced person exclusively or even partially in the treatment and care of Plaintiff's cancer patients;

H.     Continuously from November 1, 2010 to August 10, 2011 when Defendants continually refused to engage in the interactive process to identify and determine in good faith what reasonable accommodation Plaintiff needed to sufficiently perform her job duties after having become aware of Plaintiff's disabilities and needs for reasonable accommodation; and

I.     From at least around July, 2010 until August 10, 2011, when Defendants continually and wrongfully refused to rectify its discrimination against Plaintiff on the basis of her disabilities by providing the necessary reasonable accommodations for Plaintiff to succeed in her work performance in accordance with Defendants' reasonable work expectations.

61.     Even if Defendants did not have the specific discriminatory animus to discriminate against Plaintiff, which is denied, Defendants' adverse actions (and omissions to act) were caused or influenced by certain managers, directors, or owners of Defendants who were personally motivated by a discriminatory animus that was intended to cause, and in fact did cause, Defendants' adverse employment actions and omissions against Plaintiff.

65.     As a direct and proximate result of Defendants' discriminatory acts toward Plaintiff, as alleged herein, Plaintiff has suffered damages in an amount to be proven at trial, but in excess of $10,000.00 for back pay with interest thereon, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

<u>SECOND CLAIM FOR RELIEF</u>:
(ADAAA-Failure to Make Reasonable Accommodations)

66.     The foregoing allegations are hereby realleged and fully incorporated herein by reference as if fully set forth herein.

67.     Plaintiff sought from Defendants the following reasonable accommodations for her disabilities:

A.    permission to hire and maintain a medical scribe (or other comparable assistance) at Plaintiff's own personal expense to work under her direct supervision in the accurate and timely completion of patient care documentation and "paperwork;

B.    hiring or otherwise providing Plaintiff at Defendants' expense with one or more of the following: 1) an experienced, properly trained or otherwise qualified radiation oncology RN to assist Plaintiff exclusively, or even extensively, in the treatment and care of Plaintiff's patients (just as Defendants had provided for its non-disabled radiation oncologists) and 2) a nurse practitioner, physician assistant, medical scribe or other person to assist Plaintiff exclusively, or even partially, in the treatment and care of Plaintiff's patients;

C.    good faith engagement with Plaintiff in the interactive process to determine what reasonable accommodation Plaintiff needed to sufficiently perform her job duties.

68.    If Defendants had permitted had provided Plaintiff with some or all of the reasonable accommodations, as set forth above, then Plaintiff would have met or exceeded all of Defendants' reasonable expectations in the treatment and care of patients, including those with rather complicated health care treatment issues.

69.    As a direct and proximate result of Defendants' refusal to provide Plaintiff with reasonable accommodation, as set forth above, Plaintiff has suffered damages in an amount to be proven at trial, but in excess of $10,000.00 for back pay with interest thereon, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

<u>THIRD CLAIM FOR RELIEF</u>:
(Wrongful Termination)

70.    The foregoing allegations are hereby realleged and fully incorporated herein by reference as if fully set forth herein.

18

71.     On information and belief, Plaintiff was an at-will employee of Defendants continuously from around January 2, 2006 until her termination on August 10, 2011. Defendants terminated Plaintiff's employment on or about August 11, 2011. At all times relevant herein, Defendants have each regularly employed 15 or more employees.

72.     In Gen. Stat. §§ 143-422.2, *et seq,* the North Carolina General Assembly has declared it to be the public policy of North Carolina to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on the account of handicap by employers which regularly employee 15 or more employees. Gen. Stat. § 143-422.2.

73.     At all times relevant herein, the North Carolina General Assembly has declared the public policy of North Carolina to be as follows:

    A.      that discrimination based upon a disabling condition or handicap is contrary to the public interest and to the principles of freedom and equality of opportunity and that the rights of such persons should be protected. N.C. Gen. Stat. § 168A-2; N.C. Gen. Stat. §§ 143-422.2, *et seq.*

    B.      that the practice of discrimination on the basis of a disabling condition threatens the rights and proper privileges of the inhabitants of this State; and that such discrimination results in a failure to realize the productive capacity of individuals to their fullest extent. N.C. Gen. Stat. § 168A-2;

    C.      that discriminating on the basis of disabling condition or handicap foments domestic strife, unrest, and deprives the Stat of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general. N.C. Gen. Stat. § 143-422.2;

19

D.      that every employee be provided a safe work environment that is free from recognized hazards that cause or likely to cause death or serious injury or serious physical harm to employees. N.C. Gen. Stat. §§ 95-126, *et seq*; and

E.      that every employee be provided with the right to file a complaint and written request for an inspection by the Occupational Safety and Health Division of the North Carolina Department of Labor ("OSHA") and/or to participate in the actual, physical workplace inspection. N.C. Gen. Stat. §§ 95-126, *et seq.*

74.     At all times relevant herein, Plaintiff was subjected to, and a beneficiary of, the privileges and protections of the above-referenced public policy of North Carolina.

75.     Around Winter of 2011, Plaintiff and other employees developed a belief in good faith that Defendants' workplace was unsafe and contaminated, possibly with the harmful chemicals that had been maintained in the workplace.

76.     On or about February 2011 and in good faith, Plaintiff filed a written complaint and request for and OSHA inspection on behalf of herself and other employees with the North Carolina Department of Labor. At Plaintiff's request, OSHA conducted an exhaustive inspection of Defendants' work space and the conditions therein. A true copy of the results of such OSHA inspection are attached hereto as EXHIBIT C and is incorporated herein by reference.

77.     On information and belief, Defendants' managers, directors, shareholders, and staff were generally aware that Plaintiff had filed a written complaint and request for OSHA inspection with the North Carolina Department of Labor by on or about March 2011.

78.     On information and belief and at all times relevant herein, Defendants' motivation for terminating Plaintiff's employment was:

A.     because of Plaintiff's physical or mental impairments of major depression and/or ADD which substantially limited one or more of Plaintiff's major life activities during the period of her employment;

B.     alternatively, because Plaintiff, at all relevant times, had a record of such an impairment;

C.     alternatively, because Plaintiff, at all relevant times, was regarded as having such an impairment; or

D.     alternatively, because Plaintiff in good faith filed a written complaint and request for an OSHA inspection and/or participated in the actual, physical workplace inspection.

79.     Defendants' actions in terminating Plaintiff's employment for the reasons asserted violated the public policy of North Carolina in that the same were injurious to the public or against the public good.

80.     As a direct and proximate result of Defendants' wrongful acts, as alleged herein, Plaintiff has incurred damages in an amount to be determined at trial, but in excess of $10,000.00.

81.     On information and belief, all wrongful acts of Defendants, as alleged herein, were committed against Plaintiff with malice and/or with a conscious and intentional disregard of, and indifference to, the rights of Plaintiff, which Defendants knew, or should have known, were reasonably likely to result in damage or other harm to Plaintiff.

## DEMAND FOR JURY TRIAL:

Pursuant to N.C. R. Civ. P. 38, Plaintiff hereby demands a trial by jury on all triable issues.

<u>PRAYER FOR RELIEF</u>:

WHEREFORE, Plaintiff prays unto the Court as follows:

1.    That Plaintiff receive judgment against Defendants jointly and severally for Plaintiff's pecuniary damages, including back pay with interest thereon, lost benefits, future pecuniary losses, and other damages in the amount to be determined at trial, but in excess of $10,000.00, pursuant to 42 U.S.C. § 12117, 42 U.S.C. § 2000e-5(g) and the common law;

2.    That Plaintiff receive judgment against Defendants jointly and severally for all compensatory damages, including that for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses in an amount to be determined by a jury, but in excess of $10,000.00;

3.    That the Court grant Plaintiff injunctive relief requiring Defendants, both jointly and severally, to act as follows to enjoin Defendants from engaging in any further acts of discrimination or retaliation against Plaintiff and such other injunctive relief appropriate to remedy the violation of Plaintiff's rights;

4.    That Plaintiff be awarded interest and her court costs, including expert witness fees, deposition costs, and attorney's fees, as allowed by law;

5.    That Plaintiff receive punitive damages against Defendants jointly and severally, pursuant to N.C. Gen. Stat. § 1D-1, *et seq.*, in an amount to be determined by a jury;

6.    That Plaintiff receive a jury trial for all triable issues; and

7.    That the Court grant Plaintiff such other and further relief as the Court deems just and appropriate.

This the 14th day of August, 2012.

BAILEY & DIXON, L.L.P.

By: *J. Heydt Philbeck /JAS C*

J. HEYDT PHILBECK
434 Fayetteville Street, Suite 2500
Raleigh, North Carolina 27601
Telephone: (919) 828-0731

*Attorneys for Plaintiff*



# NORTH CAROLINA
# Department of The Secretary of State

EXHIBIT

A

### To all whom these presents shall come, Greetings:

I, ELAINE F. MARSHALL, Secretary of State of the State of North Carolina, do hereby certify the following and hereto attached to be a true copy of

## ARTICLES OF AMENDMENT

## OF

## CANCER CENTERS OF NORTH CAROLINA, P.C.

the original of which was filed in this office on the 24th day of November, 2008.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at the City of Raleigh, this 24th day of November, 2008.

*Elaine F. Marshall*

**Secretary of State**

SOSID: 0376505
Date Filed: 11/24/2008 9:34:00 AM
Elaine F. Marshall
North Carolina Secretary of State
C20083230C193

ARTICLES OF AMENDMENT

OF

RALEIGH HEMATOLOGY ONCOLOGY ASSOCIATES, P.C.

The undersigned professional corporation hereby submits these Articles of Amendment for the purpose of amending its Articles of Incorporation:

1.	The name of the corporation is Raleigh Hematology Oncology Associates, P.C.

2.	The following amendment to the Articles of Incorporation of the corporation was adopted by its shareholders on the *17th* day of *December*, 2008, in the manner prescribed by law:

The Articles of Incorporation of Raleigh Hematology Oncology Associates, P.C. shall be amended by deleting the entire text of Article I Section 1.1 thereof and substituting in its place the following:

1.1	Name and Address. The name and address of the professional corporation shall be Cancer Centers of North Carolina, P.C. (the "Corporation"). 4420 Lake Boone Trail, Raleigh, Wake County, North Carolina 27607.

3.	The foregoing amendment was approved by shareholder action, and such shareholder approval was obtained as required by Chapter 55 of the North Carolina General Statutes.

4.	These Articles of Amendment will be effective upon filing.

This the *17th* day of *December* 2008.

RALEIGH HEMATOLOGY ONCOLOGY
ASSOCIATES, P.C.

By: _____

Alan Kritz, M.D., President



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Kulbir Sidhu<br>112 Holly Glade Circle<br>Holly Springs, NC 27540 | From: | Raleigh Area Office<br>1309 Annapolis Drive<br><br>Raleigh, NC 27608 |
|---|---|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 433-2012-00169 | Yamira Moreno-Cruz,<br>Investigator | (919) 856-4021 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☒ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Ola M. Wagom Jr._      05/17/2012

Enclosures(s)      Thomas M. Colclough,<br>Director      *(Date Mailed)*

| cc: | Leah M. Moore<br>Attorney at Law<br>WYRICK ROBBINS YATES & PONTON, LLP<br>P.O. Drawer 17803<br>Raleigh, NC 27619 | J. Heydt Philbeck<br>BAILEY & DIXON<br>PO Box 1351<br>Raleigh, NC 27601 |
|---|---|---|





Ms. Kolby Sidhu
112 Holly Glade Circle
Holly Springs, NC 27540

RE: OSH Inspection 315444216
OSH Complaint 208249037

Dear Ms. Sidhu:

Following your complaint, a Compliance Safety & Health Officer (CSHO) from the Bureau of Compliance, Division of Occupational Safety and Health conducted an inspection of Cancer Centers of North Carolina in Raleigh, NC on 03/14/2011.

Your complaint (itemized and underlined) is restated below, followed by our findings.

1. _Chemotherapy fume hood ventilation is ineffective which is exposing employees to chemical vapors and particulates during work associated with the drugs used at the facility. Workers in surrounding areas complain of symptoms such as, but not limited to nausea, vertigo, respiratory irritation, and black hairy tongue._

In terms of the hood and two Biological Safety Cabinets being used at in the mixing room, all three directly exhaust to the roof. Also, the duct work for the HVAC system in the mixing room is separate from the rest of the building. Interviews with employees working in the mixing room did not indicate that they were having any medical problems and the employees in the area did not notice any chemical odors in their work area.

Also, on February 17, 2011 the hood and both Biological Safety Cabinets were inspected by Environmental Safety Professionals, Inc. All three cabinets passed the inspection for air flow and particulate count. The one thing noted in the report was that the motor/blow/belts on the roof should be checked. The employer contacted the HVAC contractor who replaced a belt on one of the exhausts because of the noise that it was making.

Interviews with both employees and the employer revealed that some employees in administrative area of the facility have been complaining of symptoms such as

respiratory irritation, coughing and headaches. Employees started complaining about various symptoms on February 25th. One employee was treated onsite by a doctor and an EMS when she told the employer that she was having difficulty breathing. Also, on or around March 3rd, the same employees complained about a metallic taste in her mouth and was sent for medical treatment. At this time, the employer decided to send other employees in her work area to a doctor for a medical evaluation. All of the employees in the administrative area were relocated to a different part of the building. According to the employer, two of the doctors working in the same area were not having any problems and did not relocate. After seeing a doctor, two of the employees were told that they had experienced some type of chemical exposure.

Prior to the North Carolina Department of Labor arriving onsite, the employer had their worker's compensation insurance carrier conduct a variety of indoor air quality testing. Results did not reveal any problems with the air in the building. Mold samples taken at a later date did show evidence of mold in certain areas. However, the North Carolina Department of Labor does not have any regulations for acceptable mold levels in buildings.

The HVAC Contractor, NewComb and Company had been onsite at various times researching the problem as well. They replaced the controller for the office area, replaced a belt for the exhaust for the mixing room and flushed the system with fresh air which according to one employee it seemed to help her. According to the HVAC contractor the fresh air intake is not located near the exhaust for the mixing room. They could not find any problems with the operation of the HVAC system that would create indoor air quality problems.

Compliance Safety & Health Officers (CSHOs) did additional testing for carbon monoxide, carbon dioxide and relative humidity and all readings were all below the recommended limits for buildings. The CSHOs also looked at the chemicals being used at the facility and could not find any problems with the way that they were being used. While onsite, the CSHOs did not observe any conditions that could result in employees being exposed to chemicals. They spoke to the HVAC contractor in great depth to evaluate the air flow of the HVAC system and did not find any problems. The CSHOs recommended that the employer brings more fresh air into the building by adjusting the air exchanges on their HVAC system.

There were no violations of any North Carolina Occupational Safety & Health Standards observed so no citations will be issued.

If you do not agree with our investigation results, you may seek further clarification from the District Supervisor or Bureau Chief. If dissatisfaction with the determination still remains after further conversation with the Dist whorict Supervisor or Bureau Chief, you also have the right to an informal review by the Director's Office. A review may be obtained by submitting a written statement of your position to the Director's Office at the following address:

NC Department of Labor
OSH Director's Office
1101 Mail Service Center
Raleigh, NC 27699-1101

The

Your action on behalf of Safety and Health in the workplace is sincerely appreciated.

Sincerely,

Ron Wells

Ron Wells, Supervisor
Bureau of Compliance

/SW

# WAKE COUNTY CLERK OF SUPERIOR COURT
## N. LORRIN FREEMAN
### CIVIL RECEIPTING

Payor **Kulbir Sidhu, M.D.**

File Number _____

Payee _____

_____

_____

**(Atty Pd, Address, Ins Co, Case Caption – Upset Bid)**

### TO BE FLAGGED "Y"

| | | |
|---|---|---|
| CVSC Superior | $ 200.00 | [X] |
| CVDC District | $150.00 | [ ] |
| Small Claims Appeal | | |

M#s     #21435    $_____
CONF OF JUDGMENT #21400
     $_____

SUPPLMNT PROC    #21400    $_____

TRIAL DE NOVO    #24310    $_____
    (Appeal Arbitration)
MOTIONS    #21450    $_____

ALIAS & PLURIES    #21455    $_____
ENDORSEMENTS

### Abstract Number   JMT _____

JA JUDGMENT PAYMENTS #26115
   FULL [    PARTIAL [ X

> or = $1.00 REFUND   #29100   $_____

ATTORNEY FEES    #24610    $_____

ARBITRATION FEE M#   #24311    $_____

JA WRITS    #21430    $_____
    (Executions/Possession)

JA TRANSCRIPT    #21440    $_____

EFFECTIVE: 7/1/11

### TO BE FLAGGED "N"

CDDC   $225.00       $_____
(Divorce)

CVDC   $150.00       $_____
(Domestic – Divorce not included)

Arbitration Fee No M#   #24311   $_____

Pro Hac Vice      #24625   $_____
(Out of State Atty Fees)
Out of State Bar Fee    #24626   $_____

| LIMITED DRIVING PRIVILEGE   #24335 $_____ |
|---|

Business Court     # 21122   $1,000 _____

BOND FORFEITURE     #22800 $_____
(Before Judgment)

REGISTRATIONS     #21400 $_____

BONDS - SPECIFY _____
(Attachment, Restraining Order, Appeal )
           #26210 $_____

OTHER     CODE #_____    $_____

TRUST (Minor's portion)    #26310 $_____

DEPOSIT     #26600 $_____
(Surplus Funds, Ernest Money, Etc.)

CONDEMNATIONS    #26130 $_____

UP-SET BID     #26700 $_____

Posted By: _____

File No.

# LEAD DOCUMENT FOR SCANNING

# AUDIT TRAIL

| Date Filmed | Description | Film No. |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |